## LOWRY v. ÆTNA LIFE INS. CO. et al.

### No. 12368.

Court of Civil Appeals of Texas. Dallas.
Sept. 24, 1938.

Rehearing Denied Oct. 22, 1938.

E. G. Senter and Sarah Cory Menezes, both of Dallas, for appellant.

Lawther & Cramer, of Dallas, for appellees.

YOUNG, Justice.

Oren M. Lowry sued Ætna Life Insurance Company, W. G. Harris and George V. Peak, Jr., to recover $30,000—interest, penalty and attorney fees—on an accident insurance policy issued by the company, insuring Robert C. Lowry; the plaintiff-brother of assured being named as beneficiary. W. G. Harris was general agent

for the company in Dallas and Northeast Texas, through whose agency the policy in suit was issued, the same having been solicited by defendant Peak, who was authorized to solicit insurance, collect premiums, deliver renewal receipts, etc. On November 4, 1929, the insured was killed while en route from the City of Mexico to the City of Torreon in an aeroplane that crashed against a mountain 20 minutes out the City of Mexico. After some negotiations the company denied liability, on the sole ground that the policy lapsed September 15, 1929, for non-payment of the annual premium of $100. At the conclusion of the evidence, the court instructed a verdict for defendant Harris, but as to the other defendants the case was submitted to a jury on special issues and, based upon their answers, judgment was rendered for the defendants, from which this appeal was prosecuted.

In the course of the trial below, counsel for defendants correctly stated that, "The only question here is whether the policy was in force at the time he (insured) died; and then if he died under circumstances that would relieve the company of liability". It is conceded that the policy was in force up to and including September 14, 1929, the annual premium of $100 having previously (on November 28, 1928) been paid. Based upon these undisputed facts, plaintiff first contends that the policy was alive and in full force on November 4, 1929, the date of the accident—that is, that the payment of the annual premium (November 28, 1929) and its acceptance by the company, purchased insurance for twelve months from that date, therefore that the court erred in overruling his motion for judgment. The defendant contends that, plaintiff's pleading failed to present this issue, therefore, that the proposition urged should be overruled. Plaintiff's petition is quite lengthy and, we think, abundant allegations may be found upon which this contention may be predicated. Allegations are to the effect that, defendant's general agent and those under him were fully authorized to collect premiums, irrespective of the date of their maturities, and to reinstate policies and to maintain the contract in force, and it is alleged generally, that both the plaintiff and the insured had complied with all the provisions of the policy and that the death of the insured was not within the terms of any exception or qualification of the policy, excusing the defendant from the payment of all or any part of the stipulated indemnity.

The following provisions of the policy are pertinent to this inquiry that: "The principal sum of this policy is Thirty Thousand Dollars. The premium for term of this policy is One Hundred Dollars. The date of this policy is September 14th, 1927. This policy is issued for a term of Twelve (12) months to commence on the day this policy is dated, beginning and ending at twelve o'clock noon, standard time of the place where the insured resides, but it may be renewed with the consent of the company by the payment of the premium in advance at the Company's premium rate in force at the time of renewals". The policy also contained a provision for reinstatement, as follows: "If default be made in the payment of the agreed premium for this policy, the subsequent acceptance of a premium by the Company or by any of its duly authorized agents shall reinstate the policy, but only to recover loss resulting from accidental injury thereafter sustained".

The policy was not renewed under the renewal provision above set out, but was reinstated on November 28th, under the provision for reinstatement of lapsed policies. Upon a trial to a jury, their answers to issues submitted were: (1) that George V. Peak, Jr., did not agree with plaintiff, O. M. Lowry, prior to September 1, 1929, to notify the latter, should Robert C. Lowry fail to pay the premium on the policy, so that O. M. Lowry would be enabled to pay said 1929 premium in due time; (2) that before September 1, 1929, George V. Peak, Jr., had knowledge of the fact that Robert C. Lowry had taken employment with a company operating aeroplanes; (3) that George V. Peak, Jr., and Robert C. Lowry had an agreement that the $100 premium on the policy in suit might be paid to said Peak in quarterly installments; (4) that Peak had no authority to make such agreement on behalf of appellee; (5) that prior to September 14, 1929, Robert C. Lowry failed to keep his promise to pay said Peak a quarterly installment of $25 due in 1927, and similar installments of $25 for the year 1928; (6) at the time of his death said Lowry was traffic manager for a Mexican Aeroplane Company, and was not riding without payment of fare; and that Robert C. Lowry was never advised that the renewal receipt for 1929 had been.

sent from the home office of the company to Harris, the general agent, for delivery to said Lowry upon payment of the regular premium of $100. Under the above statement of the case, which we deem sufficient for the disposition of this appeal, it will be necessary only to discuss the first and second propositions of appellant based on numerous assignments of error; the remaining assignments, in the main, having been disposed of adversely to him by the jury answers, and which the evidence was sufficient to support. Such propositions are (the second being in the alternative):

(1) "The premium paid in 1928 created a new contract of insurance for a term of twelve months beginning November 28, 1928; and the policy was in force when insured died on November 4, 1929".

(2) "On the undisputed testimony of defendants and the insurance company's agents, the policy was continued in force for a term of twelve months beginning September 14, 1929 by virtue of credits extended by the company and its agents, subject to the company's power of cancellation, which was not exercised; and the policy was in force when insured died on November 4, 1929".

Neither as an issue of fact arising under the evidence nor as a matter of law, did the premium payment of November 28, 1928, create a new contract of insurance for a period of twelve months thereafter, by which the policy could be considered in force on November 4, 1929. There is no testimony in the record concerning the contents of this receipt and, of course, no justiciable issue is before us as to its wording. Elliott on Contracts, Vol. 5, par. 4288, cited by appellant, says: "Whether a renewal creates a new contract depends upon its terms. It has been held that every renewal of a policy of insurance being upon a new consideration and optional with both parties creates a new contract and is, *unless otherwise expressed, subject to the terms and conditions which are contained in the original policy*" (Italics ours).

We find the following statement in 24 Tex.Jur. page 741, Sec. 52. (Insurance), citing cases: "In the absence of an agreement to the contrary, the presumption is that the renewal of an insurance policy is upon the same terms and conditions and for the same amount as provided in the original policy". The terms, under the

original policy of appellee, were for a period of twelve months intervening September 14th of each year. The 1929 receipt still in the possession of appellee's general agency, and placed in evidence by it, was to the same effect; but, as just stated, no issue having been raised by appellant as to the contents of the 1928 receipt, all matters relative to the terms thereof were waived. Dallas Hotel Co. v. Davison, Tex.Com.App., 23 S.W.2d 708. The question remains: Did the issuance by appellee of its renewal receipt of November 28, 1928, create a new contract of insurance, as a matter of law, continuing twelve months from that time, the insured's accidental death having occurred November 4th previously? We do not think so, under this record. It is not disputed that the insurance policy, theretofore issued, was reinstated by the delivery to Robert Lowry of such receipt, as authorized under the policy provision heretofore quoted. What is the ordinary or legal meaning of "reinstate"? It is defined in Webster's New International Dictionary as: "To enstate again; to place again (in possession or in a former state); to reinstall; to reestablish; to restore (to a state from which one has been removed)". Nowhere in Words & Phrases, from the first edition to the present (4th) is the word given any other legal meaning in the decisions than in substance the following: "To 'reinstate' a policy holder or one who has allowed his policy to lapse does not mean new insurance or taking out a new policy, but does mean that the insured has been restored to all the benefits accruing to him under the policy contract, the original policy. Missouri State Life Ins. Co. v. Jensen, 139 Okl. 130, 281 P. 561, 562." See 3 Words and Phrases, Fourth Series, p. 349. The holding of the Commission of Appeals, in State Mutual Life Insurance Co. v. Rosenberry, 213 S. W. 242, 243, decided in 1919, is alone sufficient to justify the overruling of appellant's first proposition. It was there said [page 245]:

"There is some conflict in the authorities as to the effect of a reinstatement of a policy after lapse for failure to pay the premium. Some courts hold that there is a new contract of insurance as of the date of the reinstatement, but containing all the terms of the original policy, and thus hold that the clause rendering the policy incontestable applies to the new contract and authorizes a contest for the

period named after the reinstatement. Pacific Mutual Life Ins. Co. v. Galbraith, 115 Tenn. 471, 91 S.W. 204, 112 Am.St. Rep. 862, and cases cited.

"But we think that the better rule and the one that would come nearer doing justice is to regard the contract for reinstatement, not as a new contract of insurance, but as a waiver of the forfeiture, thus restoring the policy and making it as effective as if no forfeiture had occurred, but reserving the right of the company to avoid the effect of the reinstatement by showing, if it can, that the reinstatement was induced by unfair and fraudulent means. Massachusetts Benefit Life Association v. Robinson, 104 Ga. 256, 30 S. E. 918, 42 L.R.A. 274; Goodwin v. Provident, etc., Life Association, 97 Iowa 226, 66 N.W. 157, 32 L.R.A. 473, 59 Am.St.Rep. 411; Monahan v. Fidelity Mutual Life Insurance Co., 242 Ill. 488, 90 N.E. 213, 134 Am.St.Rep. 337; Mutual Life Insurance Co. v. Lovejoy [201 Ala. 337], 78 So. 299, L.R.A.1918D, 864".

While this case was not approved by the Supreme Court, save as to the conclusion 'reached, it has often been cited in later decisions of other American jurisdictions; and, in the frequent references to it by our own appellate courts, the above statement has not been limited or questioned. True, the main point decided in the Rosenberry Case was a construction of Art. 4953, R.S. (now art. 5050, relating to insurance contracts)—yet, the effect of a reinstatement of an insurance policy was necessarily incident to the judgment there rendered. "It has been repeatedly held that a proposition assumed or decided in order to establish another proposition which expresses the conclusion of the court is as effectually passed upon and settled as the very question directly decided". Tex.Jur. Vol. 11, Sec. 95; Stephens County v. Hefner, 118 Tex. 397, 16 S.W.2d 804. In the annotations following Tatum v. Guardian Life Ins. Co., 2 Cir., 75 F.2d 476, 98 A.L.R. page 341, the Editor at page 345, after a report of the case, says: "There is considerable diversity of opinion upon the general question of the effect of a reinstatement of a lapsed or forfeited policy; but in the majority of the cases which have passed upon the specific question under annotation, the reinstatement has been held not to create a new contract of insurance, but to effect merely a continuing in force of the original contract, so that the liability of the insurer for death by suicide is not affected by the fact that death occurred within the period after reinstatement specified in the suicide clause, if the contestable period reckoned from the date of the inception of the original coverage had expired. To this effect are the decisions in Business Men's Assur. Co. v. Scott, 8 Cir., 1927, 17 F.2d 4, writ of certiorari denied in 1928, 275 U.S. 531, 48 S.Ct. 28, 72 L.Ed. 410; Mutual L. Ins. Co. v. Lovejoy, 1917, 201 Ala. 337, 78 So. 299, L.R.A.1918D, 860, as reaffirmed on this point on subsequent appeal in 1919, 203 Ala. 452, 83 So. 591; and Life & Cas. Ins. Co. v. McCray, 1933, 187 Ark. 49, 58 S.W.2d 199, affirmed in 1934, 291 U.S. 566, 54 S.Ct. 482, 78 L.Ed. 987, and petition for rehearing denied in 1934, 292 U.S. 600, 54 S.Ct. 627, 78 L.Ed. 1464."

The cases cited by appellant, of Halsey v. American Central Life Ins. Co., 258 Mo. 659, 167 S.W. 951; Kennedy v. National Acc. & Health Ins. Co., Mo.App., 76 S.W. 2d 748, and Jefferson Standard Life Ins. Co. v. Baker, Tex.Civ.App., 260 S.W. 223, do not infringe upon the reasoning of State Mutual Life Ins. Co. v. Rosenberry, supra, in that, in those cases, irrespective of the date of the policy contract, there was a provision that same should not become effective until delivery of policy, or payment of first premium, or clauses of similar import. The policy here sued on was dated and issued September 14, 1927, ending twelve months from such date, unless renewed. The undisputed fact that the 1928 premium was paid later in November is, under this record, wholly insufficient to support the contention of a new contract to continue for twelve months from the subsequent time; the cases holding otherwise going off largely on a construction of the receipt, or paper evidencing such renewed insurance. It is, therefore, unfortunate that the receipt in question was not in evidence. In MacDonald v. Metropolitan Life Ins. Co., 304 Pa. 213, 155 A. 491, 77 A.L.R. 353, also cited by appellant, the receipt being before the court, was held to be ambiguous as to the "due date" of the policy after lapse and reinstatement. In this connection, the court said [page 492]: "The date at which the reinstated policy is to begin being uncertain must be so construed as to protect the policy holder", and "if the company, in the instant case, intended the reinstated insurance to commence January 18, it should have so

stated"; the date just given referring to the inception of the policy in the case last cited. Here, the reinstatement transaction of November 28, 1928, being tantamount only to a renewal after a lapse was merely a restoration to the assured of all the benefits accruing to him under his original policy of September 14, 1927, according to its terms.

To the argument that such a construction of the dealings between the parties would result in assured's receiving less than a year's insurance for the year 1928-1929 term, it must be remembered that we are dealing with a standard provision of the policy, lawfully inserted therein, to secure prompt payment of premiums, and is in the nature of a penalty for tardiness or neglect. Vance on Insurance (2d Ed.) pg. 283, Sec. 82, pertinently says: "Accordingly, a policy is seldom found that does not contain some penal provision for the enforcement of the insurer's premium claims * * *. It is, of course, competent for the parties to make any other agreement desired as to the consequence of default on the part of insured in the payment of premiums. The policy may stipulate that the rights of the insured shall be suspended during his delinquency, and provide for their revival, subject to certain conditions, upon the payment of the over-due premiums. Of course, the insurer is not liable for any loss that may be incurred during such a period of suspension."

■ Appellant further contends that, on September 14, 1929, appellee company received a year's premium in advance, by a 60-day credit given to George V. Peak, during which time the policy in suit was not cancelled, and same was therefore in force on November 4, 1929. We see no relation between appellee's custom of giving soliciting agent Peak sixty days in which to report on the 1929 premium of the assured, and liability vel non of appellee on the policy in question. Such was an internal affair of the Dallas agency. It was in no sense an extension of credit to the policy-holder, and, under the undisputed previous dealings, could not have possibly become such until delivery of a renewal receipt to the assured by Peak, he thereby becoming personally responsible for the particular premium. The 1929 receipt involved here never left the possession of appellee. The letter of Mr. Peak of July 3, 1929, and the later wire of August 23rd, conclusively established that such

agent would extend no further credit to assured until the balance of the 1927 premium and the whole of the premium for 1928 were paid. Consequently, as a matter of law, there was no extension of credit given by either Mr. Peak or the company relative to the premium for an additional year. Furthermore, the jury findings were that the so-called credit arrangement between the assured and Mr. Peak to pay premiums in sums and at times other than as provided in the policy, had been breached by Mr. Lowry; also that the particular agreement just mentioned had not been authorized by appellee.

■ And we think that, whether or not, in the files of appellee agency, there was a specific showing of cancellation prior to November 4, 1929, was immaterial. The plain language of the policy stated that it ended at twelve o'clock noon on every succeeding September 14th, unless "renewed with the consent of the company by the payment of the premium in advance, at the company's premium rate in full force at the time of renewals". See Donaldson v. National Life & Acc. Ins. Co., Tex.Civ.App., Galveston, 53 S.W.2d 136, writ refused, construing a similar provision of an accident policy, where the court concluded that the same had lapsed by virtue of its terms. We quote therefrom [page 137]: "We can read no other meaning into the contract, and that the parties to it had the right to so stipulate the beginning, ending, and conditions attending the risk they were dealing with, goes without saying", citing 32 C.J. page 1164 sec. 277, and Duncan v. United Mut. Fire Ins. Co., 113 Tex. 305, 254 S.W. 1101, among other Texas cases. Perkins v. Associated Ind. Corp., 189 Wash. 8, 63 P.2d 499, considering an almost identical provision of an accident policy, held with reference to such insurance, in contrast with life policies, that [page 501]: "When a policy provides for its termination at a particular time like the one in the case at bar, it terminates at that time without any notice". See, also, Continental Ins. Co. v. Stratton, 185 Ky. 523, 215 S.W. 416, 8 A.L.R. 391, where, under the annotations following the opinion, are cited cases from the United States Supreme Court, Canada, England, and the great majority of the American courts, supporting the well settled rule of non-liability of the insurer for loss occurring after default in payment of premiums or assessments, although the insurer took no

affirmative action, such as declaring a suspension before loss.

We think it clear that all assignments and propositions of appellant, after consideration, should be overruled, and the judgment of the trial court affirmed.

Affirmed.

LOONEY, Justice (dissenting).

I find myself out of harmony with the majority decision, believing that the case was tried on an erroneous theory and submitted on immaterial, inconclusive and, in part, on evidentiary issues. The vital issues of the case, although properly raised by both the pleadings and proof, were not submitted, and in order that my view of the case may be properly understood, I will be forced to write somewhat at length.

I accept, as correct, the preliminary statement of the case made in the majority opinion by Associate Justice YOUNG, and shall begin my discussion immediately following that portion of the majority opinion, saying: "The policy was not renewed under the renewal provision above set out, but was reinstated on November 28th under the provision for reinstatement of lapsed policies". The provision of the policy referred to, reads: "If default be made in the payment of the agreed premium for this policy, the subsequent acceptance of a premium by the Company, or by any of its duly authorized agents, shall reinstate the policy, but only to recover loss resulting from accidental injury thereafter sustained".

Under the provision of the policy just quoted, it was entirely optional with the insured to either pay the premium or permit the policy to remain lapsed, and it was also optional with the company to accept the premium, reinstate the policy, or treat the contract at an end; in other words, the transaction of November 28, 1928, in my opinion, involved the making of a new contract, prospective in nature, in view of the provision that, the reinstated policy only covered loss thereafter sustained. For practical purposes, however, I do not think it material whether it is to be considered a new contract of insurance of that date, containing all the terms of the original policy, of simply a waiver by the company of the forfeiture and a restoration of the policy in consideration of the payment of the over-due premium, the result in either event, in my opinion, would be the same—that is, the payment of the premium and its acceptance by the company restored the contract with all its terms for twelve months from that date. The policy contains no language that forbids the application of the premium paid November 28th for the purchase of twelve months' insurance from that date, and the failure to do so, in my opinion, would unjustly deprive the insured of at least two and one-half months of insurance protection for which he had paid. In a similar situation presented in Halsey v. American Cent., etc., Co., 258 Mo. 659, 167 S.W. 951, 953, the Supreme Court of Missouri said: "This nor any other court should allow an insurance company to thus stultify itself after taking the premium for a full year, and then escape liability by interposing the technical question that by the application for the policy the insured agreed to pay the premium long before it was due". The Court of Appeals of the same state, in Lale v. Business Men's, etc., Co., 275 S.W. 962, with full citation of authorities, held that: "Where an accident policy provided for insurance for periods of three months, the premiums being payable quarterly, on 1st day of March, June, and September, acceptance by insurer of three months' payment of premium on April 18, held to entitle insured to three months' insurance from such date". To the same effect, see Kennedy v. Nat., etc., Co., Mo.App., 76 S.W.2d 748; Kesler v. Commercial Cas. Co., 39 Ga.App. 197, 146 S.E. 506. In MacDonald v. Metropolitan, etc., Co., 304 Pa. 213, 155 A. 491, 77 A.L.R. 353, a case in point, the Supreme Court of Pennsylvania held that, the period covered by a reinstated accident insurance policy which by its terms was renewable with the consent of the insurer at its expiration upon the payment of the premium within thirty-one days, and which further provided that in case of default in payment of the premium subsequent acceptance of a premium should reinstate the policy, but only to cover loss resulting from accidental injury thereafter sustained, begins, not upon the expiration of the original term, but upon the date of the countersigning of a premium receipt. Also see cases cited in the appended note to this case.

The case chiefly relied upon and quoted from by appellees is State Mut. Life Ins. Co. v. Rosenberry, 213 S.W. 242, 244, by Section B of the Commission of Appeals. The opinion in that case was never adopted by the Supreme Court, hence is not an authority, but simply persuasive. How-

ever, a careful reading of the opinion discloses that the case is not in point—in that, the precise question under discussion here was not involved, there the only questions actually involved, and necessarily the only questions decided, were stated in the opinion as follows: "There are only two questions which we think it necessary to decide: First, whether article 4953, Revised Statutes, applies to this case so as to deny the insurance company the right to defend this suit upon the ground of fraud and false representations in obtaining a reinstatement of the policy; second, whether, conceding the fraud and false representations, the insurance company was estopped as against the beneficiary, Charles M. Rosenberry, and the creditor, Woodie Rhone, to deny the validity of the policy".

So, for the reasons stated, I am of opinion that the policy in suit was in force on November 4, 1929, the date of Robert C. Lowry's death.

The substance and effect of another contention urged by appellant is that, although the annual premium due September 14th, 1929, was not paid, nevertheless, the policy had not been cancelled but was in effect on November 4th, when the assured was accidentally killed—in that, the course of dealings between the parties and the facts and circumstances otherwise show that forfeiture of the policy, for failure to promptly pay the September premium when due, had been waived by the defendant.

It seems that the insured had carried accident insurance with defendant company since 1920, and that all his dealings with reference thereto were had with George V. Peak, defendant's solicitor, who was authorized to take applications for insurance, deliver policies after being signed by the general agent, and collect premiums. It was customary for renewal certificates to be delivered to Peak several weeks prior to the due date of premiums on policies solicited by him; that he was authorized to collect premiums from the insured and deliver the renewal certificates; or could deliver the renewal certificates to the insured without payment of the premium, but in such case, became personally responsible to the company for the amount of the premium. Peak dealt exclusively with the insured on that basis—that is, he delivered renewal certificates, became personally responsible to the defendant for the amount of premiums due, and permitted the insured to repay in installments. This method of dealing is revealed in letters written, from time to time, by Peak to insured, as will be here shown.

On June 1, 1921, Peak wrote insured as follows: "Dear Sir: An installment of $18.75 is due me on your insurance today. Thanking you for this business, I am, Cordially yours, Special Agent". On January 30, 1925, he wrote insured: "Dear Bob: The $18.75 installment of December first on your accident policy is still due me at this office. Thanking you for this business and your attention to the above, I am, Cordially yours". On November 5, 1925, Peak wrote insured: "Dear Bob: You have of course received the renewal of September 1st on your Aetna accident policy which was mailed you. The first installment, $18.75, was due me at that time and in accordance with the quarterly arrangement which we have had all the while on your policy. Thanking you for this business and appreciating your attention to the above, I am, Cordially yours". On May 22, 1926, he wrote: "Dear Bob: An installment of $18.75 will be due me at this office June 1st on your Aetna Accident policy. Thanking you very much for this business and your attention to same, I am, Cordially Yours". On July 29, 1926, he wrote: "Dear Bob: The June 1st installment, $18.75, paying up the policy year beginning September 1, 1925, on your Aetna Accident Policy PA-4133, is still due me at this office. Kindly let me hear from you, and oblige. Yours very truly". On August 26, 1926, he wrote: "Dear Bob: Kindly attach the enclosed renewal of September 1st to your Aetna Accident Policy No. PA-4133. You still owe me $18.75 from last year, this amount having fallen due June 1st in accorance with our quarterly arrangement. Continuing the quarterly installment arrangement, a total of $37.50 will be due me at this office September 1st, this being the above-mentioned $18.75 and the first quarter on the policy year beginning September 1st, 1926. Kindly let me hear from you, and oblige. Yours very truly". On September 15, 1926, he wrote: "Dear Bob: I wrote to you on August 26th care of Orren, at 5537 Richard Street, Dallas, enclosing the renewal of September 1st, 1926, on your Aetna Accident Policy No. PA-4133, continuing the policy in force for one year from that date. I also called your attention to $18.75 still due me on the 1925 premium, and which, in accordance with

our quarterly arrangement, was due me at this office June 1st. I saw Orren yesterday, and he told me he did not think this letter had reached his residence. I mentioned the matter to him, as he has been taking care of your premiums during your absence from Dallas. So I now write to make sure the above has reached you. If it has not I will at once secure a duplicate renewal from the Company. Kindly let me hear from you, and oblige. Yours very truly". On November 16, 1926, he wrote: "Dear Bob: On August 26th I wrote to you at 5537 Richard Street, Dallas, enclosing renewal continuing the policy in force for one year from September 1st, 1926, your Aetna Accident Policy No. Pa–4133. Not having heard from you in reply to this letter I addressed you again on September 15th at the Capitol Station, Austin, Texas, calling your attention to the matter. Besides this renewal, you have not paid me $18.75, the balance due for the year beginning September 1st, 1925. This amount, in accordance with our quarterly arrangement, was due me on June 1st. I have not been in a hurry for the money, and am not now, but naturally, when advancing premiums, I want to be sure that the assured has received renewals mailed, and approves of my action in the matter. Won't you please let me hear from you, whether you are ready to pay the $37.50 now past due or not? There will be another payment of $18.75 due December 1st, making a total of $56.25 due me December 1st in accordance with our old quarterly understanding. Orren tells me you have been moving about continually and for some time, and I am wondering whether any of my letters have reached you in the last several months. If the 1926 renewal is not in your possession please advise, that I may secure a duplicate from the Company. Appreciating a reply as soon as you find it convenient, I am Yours very truly". On May 11, 1927, the insured wrote Mr. Peak as follows: "Dear George: I am ashamed for not having written you sooner regarding the amount due you. Have been tied up here with several accounts that are in the courts that involve several thousand dollars and expecting a settlement daily. However, I have sent to my brother a check that will cover your account and several others and you will receive a check from him in a few days, if he is in the city at the present time. I have not the slightest idea when the policy time expires.

Please advise me, through O. M. L. Excuse my derelictions in this matter, but have been so darned jammed up financially with money owing me and uncollectable that I have not been able to do much planning. With best regards, I am Sincerely yours". On May 21, 1927, Peak wrote O. M. Lowry, brother of the insured and the beneficiary in the policy, in regard to the status of the account between Peak and insured, as follows: "Dear Orren: I thank you very much for your check for $93.75 received on the 16th inst., paying to September 1st, 1927 premiums due on Robert C. Lowry's Accident Policy No. Pa–4133. This amount includes the last quarterly installment of $18.75 of the annual premium of September 1, 1925, and the annual premium of $75.00 of September 1, 1926. The next premium due on this insurance will be the $75.00 annual premium of September 1, 1927, which, if desired, may be paid in quarterly installments of $18.75 each, September 1, 1927, December 1st, 1927, March 1, 1928, and June 1, 1928. I believe this gives you the desired information as to the status of this contract. Will you please advise Bob of the above as he wrote me on 11th inst., from Edinburg requesting that I advise through you concerning the above; also please be sure to tell him that it has been a pleasure to take care of this business and that I hope he will call upon me whenever I may be of further service. With kind regards and thanking you both, I am Cordially yours". On August 15, 1927, Peak again wrote the insured the following: "Dear Bob: Kindly attach the enclosed renewal of September 1st, 1927 to your Aetna Accident Policy No. PA–4133. The $75.00 premium on same being due me at this office on that date. This premium may be paid as in previous years, in quarterly installments of $18.75 each, on September 1st and December 1st, 1927; March 1st and June 1st, 1928. I am glad to hear from Orren that you are getting along fine down in the valley and hope your prosperity may continue. Thanking you very much for the continuance of this business and trusting that you will advise when I can serve you further, I am Cordially yours".

The first policy was abandoned and another issued in lieu; and with reference to the latter, Peak wrote the insured under date of August 30, 1927, as follows: "Dear Bob: If you will fill out carefully, in detail, date, sign and return to me the en-

closed Aetna application form 3000-A along with the September 1st, 1927 renewal on your Aetna Accident Policy No. PA–4133, same will have our prompt attention. Do you still prefer to pay the premium quarterly? On the new policy of $30,000—$100.00 weekly indemnity—the premium would be $100.00 annually or $25.00 quarterly. If the new policy is issued, the old one PA–4133 will be cancelled and so we must have the September 1st, 1927 renewal returned for credit. Kindly let me have this application at your earliest convenience, as I am planning on going on a vacation in September and would like to dispose of this matter before leaving. Thanking you very much for this business, I am Cordially yours". On September 7th, Peak again wrote the insured in regard to the substitution of the new policy for the older one. On December 6, 1927, the following letter was written by Peak to the insured: "Dear Bob: There is now due me at this office $28.13 on your insurance. This includes the second quarterly payment of $25.00 on the $100.00 annual premium of September 14th, 1927 on your Aetna Accident Policy No. PA–142373 and the earned premium on the old Policy No. PA–4133, from September 1st to September 14th, 1927 of $3.13. You will recall that you were protected under the old Policy from the renewal date, September 1st, until the date the new policy was issued, September 14th; which amounts I have, personally, paid the Company for you. I want to thank you very much for this business and hope you are getting along fine, and will always drop in to see me when you are in Dallas. Cordially yours". And, on July 30, 1928, Peak wrote insured, calling his attention to a balance of $25 due on the September 14, 1927, premium on the new policy. And on August 30, 1928, wrote insured: "Dear Bob: Please attach to your Aetna Accident Policy No. PA–142373 enclosed renewal of September 14th. The $100.00 premium may be paid in installments of $25.00 each, September 14th, December 14th, March 14th, 1929, and June 14th, 1929, as you have preferred to do in previous years. I would call your attention to $25.00 still due me on the September 14, 1927, premium of this policy. Appreciating your attention to same, I am, Cordially yours". On September 27, 1928, Peak wrote insured, calling his attention to a balance due of $50, which included $25 balance from 1927, and the first quarter installment on the September 14, 1928,

premium, and in a footnote, mentioned the fact that he had forwarded the September 14, 1928, renewal certificate. On December 7, 1928, he wrote insured, calling attention to a balance of $75 due, $25 from 1927 and $50 on the premium for 1928; and, on December 31, wrote in regard to the same matter. On February 8, 1929, wrote insured as follows: "Dear Bob: I have not had the pleasure of hearing from you since early last year. The June installment of $25.00 on annual premium of September 14, 1927, policy No. PA–142373, is still due me. I took care of the September 14, 1928 annual premium, $100.00, for you when it fell due. According to your quarterly arrangement the September and December installments of this amount are also now past due and another installment of $25.00 will be due March 14, 1929. This makes a total of $75.00 now long past due. Won't you please let me hear from you at an early date? With kind regards and appreciating your attention to the above, I am, Cordially yours". On March 1, 1929, Peak wrote calling insured's attention to the fact that he was behind $100, $25 on the 1927 premium and $75 on the 1928 premium. And, on April 11th, 1929, wrote insured as follows: "Dear Bob: Not having received the $100.00 remittance discussed when you were in the office last month, I am writing to call the matter to your attention. With kindest regards, and appreciating your attention to the above, I am, Cordially yours". On May 31, 1929, wrote as follows: "Dear Bob: Of the $125.00 past due me on your Aetna Accident Policy No. PA–142373, $25.00 is the unpaid balance of September 14th, 1927, and the remaining $100.00 is the entire premium of September 14th, 1928. When in my office, about two months ago, you told me you would send me check for same at once. I have not heard from you since that time. You can readily understand, while anxious to extend you every possible accommodation, that this has run longer, I am sure, than you would expect me to carry it. Won't you please let this matter have your attention without delay? Cordially yours".

The correspondence set out above reveals not only the course of dealings, but the status of the insurance contract at the time the renewal certificate for the 1929 premium was issued, with reference to which, on July 3, 1929, Peak wrote the insured as follows: "Dear Bob: The renew-

al for 1929 on your Aetna Accident policy No. PA–142373 will come up on September 14, only a little over 60 days from now. I am trying to get things in shape for a vacation before that time and so am writing you in hope that we can get your account straightened out. As you still owe me $125.00 on premiums on this policy for 1927 and 1928 you will, of course, agree with me that the balance must be taken care of before further renewal of the policy. I am sure that you have merely overlooked this matter or you have been traveling about a great deal and, no doubt, it has escaped your attention. I am sorry you could not be with us last month when we got out the largest number of Delts for a number of years in Dallas. Trusting that you will be up this way soon, I am Cordially yours". And, on July 25, 1929, Peak wrote insured, calling attention to the unanswered letter of July 3rd, stating that he was leaving next month, would be away from Dallas during the fall; and on August 23, 1929, wired insured as follows: "I leave August thirtieth for three months in Europe stop renewal date your Aetna accident policy PA one four two three seven three is September fourteenth stop no reply received to my letter to you July third stop I must know by August twenty-ninth what you will do before I can consider paying another premium for you".

The above correspondence reflects the status of the affairs when early in September, 1929, Peak left for Europe. He turned over to Mr. LaPrelle, Assistant General Agent of defendant company at Dallas, the Lowry renewal receipt, told LaPrelle the amount Lowry owed—$125 back premium—exhibiting copies of the letters written Lowry, authorized LaPrelle to collect the amount Lowry owed on back premiums, but gave instructions that the renewal receipt was not to be delivered to Lowry unless he paid the $125 back premium, also the annual premium due September 14th. In regard to these matters, Mr. LaPrelle testified that he was acting for Peak, but, at the same time, was discharging his duties to the defendant company; that he carried out Peak's instructions, and would have declined to deliver the renewal receipt without the payment of the $225; that he sent no notice to either the insured or his beneficiary, and did not know of any having been sent.

The above reflects the status at the time of the death of insured on November 4,

1929—that is, the renewal receipt for 1929 was being held by LaPrelle for Peak under Peak's instructions, as just stated.

Mr. Harris, general agent of defendant company at Dallas and for Northeast Texas, testified that the renewal receipt for September 14, 1929, was delivered to Peak about August 4th; that Peak was authorized to hold the receipt for 60 days after the due date before returning the same or making a report thereon; that, in the meantime, witness did not know whether the premium had been paid or not, and that no charge therefor had been made by defendant against Peak. Howard W. Veach, bookkeeper in charge of the books and records of the Harris agency (however not employed by the agency but by the company) testified in part that, where a premium is not paid, the policy card (a card kept in the files, containing in general outline a description of the policy and its history) is placed in the lapsed section—that is, when the policy is cancelled; that the cancellation of policies comes under Mr. LaPrelle's supervision and the card is placed in the cancelled section the day the policy is cancelled; that, according to the company's rules, they had 60 days in which to report premiums paid or cancel the policy; that they were compelled to make reports to the company on failure of the renewal 60 days after the premiums are due; that the company gave 60 days. George V. Peak testified that, on September renewals, he had to get the money or renewals back by about November 25th; that had been the custom for 20 years.

Mr. Harris, at another point in his testimony, said: that he noticed the account of the accidental death of the insured in the newspaper; that a few days later, Mr. Scarborough, brother-in-law of deceased, inquired as to the status of the policy, and witness told Scarborough that he thought the policy had lapsed, but would have to see Peak's records before he could know for certain, couldn't determine without knowing what Peak had done. The testimony of Mr. Harris tends to show that the policy card was marked "lapsed" after information was received that the insured had been accidentally killed.

This condensed statement of the evidence, in my opinion, tends strongly to show that the defendant waived forfeiture of the policy, which could have been insisted upon, for failure to promptly pay the September 14, 1929, premium. The renew-

al receipt was in the hands of Mr. La-Prelle at the time of the death of insured, was being held under the instructions of Peak (traveling in Europe) to be delivered on payment of $225 (back premiums to Peak $125, and the annual premium due September 14, 1929, $100). At the time (November 4, 1929) insured was killed, the 60-day period during which Peak was allowed to retain the renewal receipt and collect the premium had not ended, no record had been made cancelling the policy; in fact, after the death of insured, inquiry being first made of Mr. Harris, general agent, as to the status of the policy, he could not answer definitely, although the policy card, which was in the files in his office, gave a history of the policy, and Peak's record, together with instructions with reference to the matter, were in the keeping of Mr. LaPrelle, defendant's assistant general agent.

So I am of opinion that, under the first proposition discussed, it should be held as a matter of law that the policy was in force at the time insured met death; and, under the second proposition discussed, that the evidence raised the issue of waiver of forfeiture for failure to promptly pay the 1929 annual premium, which was not submitted, but if it had been and found for plaintiff, would also have shown that the policy was in full force and effect at the time of the death of the insured.

Thus, we are brought to consider the questions, whether or not the insured died under circumstances that would relieve the company of liability; and whether or not defendant is estopped to urge such circumstances to defeat recovery.

The defendant company urged as a defense that the death of Lowry occurred under circumstances that absolved it from liability. This defense arose as follows: The policy contained provisions to the effect that, the Company would not be liable for any injuries sustained by the insured while in or on any vehicle or mechanical device, or aerial navigation, or in falling therefrom or therewith; however, by a rider that became a part of the contract defendant stipulated that, in addition to all other stipulations in the policy, after December 1, 1927, it would indemnify to the extent of the minimum amount provided in the policy—towit the sum of $30,000—subject, otherwise, to the terms and conditions of the policy for any loss specified in the policy, which should result from injuries caused by the hazard of aviation while insured should be riding as a fare-paying passenger, either in a licensed passenger aeroplane, etc., provided by an incorporated passenger-carrier and while operated by a licensed pilot other than himself, upon the regular passenger route between definitely established airports.

In an amended answer filed September 4, 1935, defendant, for the first time, plead as a defense that, at the time insured was killed, he was riding in the aeroplane as a nonfare-paying passenger, as an employee of the Aeronautical de Transportes, S. A., a Mexican corporation, owner and operator of the aeroplane, and that when killed insured was traveling on the aeroplane in the performance of duties as traffic manager of the corporation. In answer to an issue submitted in negative form, the jury found that, at the time of his death, insured was not riding "without the payment of fare", but this finding is based upon such meager evidence that I am unwilling to stress the same.

As before shown, within a few days after Lowry's death and before the institution of suit, defendant denied liability and refused to pay the beneficiary, on the sole ground that the policy had lapsed, for failure to promptly pay the September 14, 1929, premium, before the death of insured. The additional defense was set up nearly five years after plaintiff employed counsel and instituted the suit. Plaintiff alleged that, under the facts and circumstances, defendant was estopped to deny liability on a ground other than that the policy had lapsed for failure to pay the September 14, 1929, premium. The record discloses that the company's general agent, within a few days after the death of insured, knew the manner thereof, and I think the facts and circumstances show that, within a few days, he could have ascertained the status of the insured on the aeroplane at the time of being killed —that is, whether or not he was a fare-paying passenger at the time; in other words, I think the evidence clearly raised the issue of estoppel, and that the same should have been submitted.

The doctrine is settled in this State that, where with knowledge of the material facts, the defendant denies liability and refuses payment on a specific ground, other than the ground urged after the employment of counsel and the institution of suit, estoppel is a complete answer to such

defense. See National, etc., Ass'n v. Murphy, Tex.Civ.App., 78 S.W.2d 223, 227, and authorities cited.

The statute, in my opinion, contemplates that all decisive issues of fact, raised by pleadings and evidence, shall be submitted, to the end of properly adjusting the interests of litigants and attaining the ends of justice; in truth, courts have no other reason for their existence, and where, as is apparent here, the case was tried on erroneous theories and submitted on immaterial and inconclusive issues, I think the case should have been reversed and remanded for further proceedings, in harmony with the doctrine announced in Missouri, K. & T. Ry. Co. v. Langford, Tex. Civ.App., 201 S.W. 1087; Citizens' Cotton Oil Co. v. Elliott, Tex.Civ.App., 294 S.W. 654, 656; City Nat. Bank v. Eastland County, Tex.Civ.App., 12 S.W.2d 662, 673.